UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ALAN WILLIS,

      Petitioner,

                                CASE NO. 2:02-CV-72436
v.                               JUDGE BERNARD A. FRIEDMAN
                                MAGISTRATE JUDGE PAUL J. KOMIVES

CAROL R. HOWES,

      Respondent.
_____/

## REPORT AND RECOMMENDATION

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

II.    REPORT:[1]

A.    *Procedural History*

Petitioner Michael Alan Willis is a state prisoner, currently confined at the Lakeland Correctional Facility in Coldwater, Michigan. On June 25, 1993, petitioner was convicted of first degree felony murder, MICH. COMP. LAWS § 750.316; armed robbery, MICH. COMP. LAWS § 750.529; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Macomb County Circuit Court. On September 14, 1993, petitioner was sentenced to a mandatory term of life imprisonment without possibility of parole on the murder conviction, a concurrent term of life imprisonment on the armed robbery conviction, and

---

[1] For the most part, this Report mirrors the initial Report I filed on November 12, 2009. It differs in its discussion of the procedural history, which takes account of events since my initial report, and in its consideration of petitioner's amended reply brief.

a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction. Petitioner's convictions arise from the robbery and murder of Sam Youkhanna, the owner of Joseph's Keg Beer and Wine party store, on January 20, 1999. The principal evidence against petitioner consisted of eyewitness testimony identifying him as the perpetrator, in particular the testimony of Jim Berlin, an employee of the party store, and Michael Crafard and Bob Tanalski, who were sitting in a car outside the store at the time of the crime.

Following the conclusion of his state court appeals and post-conviction proceedings, petitioner filed an application for the writ of habeas corpus in this Court on June 12, 2002. Petitioner's application presented various ineffective assistance of counsel claims as well as a claim that the prosecution suppressed exculpatory evidence in the form of (a) a North Caroline driver's license photograph of petitioner shortly before the crime and (b) evidence regarding a palm print found at the scene of the crime. On April 25, 2003, the Court granted the respondent's motion to dismiss, concluding that petitioner's habeas application was barred by the statute of limitations contained in 28 U.S.C. § 2244(d). The Court denied petitioner's request for a certificate of appealability on June 30, 2003, and the Sixth Circuit denied a certificate of appealability on March 9, 2004. *See Willis v. Jones*, No. 03-1805 (6th Cir. Mar. 9, 2003). On April 25, 2007, petitioner filed a motion for relief from judgment pursuant FED. R. CIV. P. 60(b). The Court denied the motion on May 10, 2007. The Sixth Circuit, however, granted petitioner's request for a certificate of appealability and partially reversed. Specifically, the Sixth Circuit held that the Court had erred in denying petitioner's Rule 60(b) motion with respect to his claim relating to the newly discovered palm print evidence, concluding that the claim was timely raised under 28 U.S.C. § 2244(d)(1)(D), because the factual predicate of that claim could not have been discovered until the palm print record

2

was disclosed to petitioner on June 24, 1998. *See Willis v. Jones*, 329 Fed. Appx. 7, 16-17 (6th Cir. 2009). Accordingly, the Sixth Circuit remanded the matter to this Court for consideration of petitioner's "habeas application to the extent that its claims for relief are based on the 1998 disclosure of the palmprint record." *Id*. at 18. Accordingly, only this claim is currently before the Court.

On May 18, 2009, I entered an Order requiring respondent to file an answer addressing the still-pending claim by July 20, 2009, and granting petitioner the right to file a reply within 30 days of receipt of respondent's answer. Respondent filed her answer on July 20, 2009. On November 12, 2009, I filed a Report recommending that the Court deny petitioner's application, and that the Court deny petitioner a certificate of appealability. As of the date of that Report, petitioner had not filed a reply brief. On December 2, 2009, the Court entered an Order adopting my Report, and entered judgment in favor of respondent. Petitioner subsequently filed a motion to recall the Report and Recommendation, arguing that he had previously submitted several motions to the Court, as well as a motion to stay the time for filing a reply while these motions were pending. On December 14, 2009, the Court granted petitioner's motion, vacated its judgment, and referred the matter to me for consideration of petitioner's pending motions for discovery, appointment of counsel, and to stay the time for filing a reply. On May 4, 2010, I entered an Order denying petitioner's motions for discovery and for appointment of counsel, and granting petitioner until June 18, 2010, to file a reply brief. Petitioner filed a reply brief on June 23, 2010, and a motion to amend his reply brief on July 6, 2010. By order entered this date, I have granted petitioner's motion for leave to amend his reply brief. The merit of petitioner's remaining claim is thus now ready for disposition by the Court.

B.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

4

However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D.

5

Mich. 2002) (Tarnow, J.).

C.   *Analysis*

Petitioner's sole remaining claim is that the prosecution suppressed evidence of, and the officer in charge of the case testified falsely to, the fact that the state police had petitioner's palm print on file and thus could have compared that palm print to the palm print lifted from the scene. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.   *Clearly Established Law*

The Due Process Clause requires the state to disclose exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, in order to establish a *Brady* claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Petitioner bears the burden of establishing each of these three elements. *See Carter*, 218 F.3d at 601. Further, although *Brady* requires disclosure of exculpatory evidence, it is well established, that "*Brady* . . . does not require the government to create exculpatory material that does not exist." *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980); *see also*, *Richards v. Solem*, 693 F.2d 760, 766 (8th Cir. 1982) ("Although the state has

a duty to disclose evidence, it does not have a duty to create evidence.").

    2.    *Analysis*

Petitioner presents his *Brady* claim as evidence of a police conspiracy to convict him of murder based on his failure to assist them with the investigation of another kidnapping and murder committed by his step-brother. In making his *Brady* argument, petitioner contends that "a palmprint found at the scene of the crime–believed to be the killer's–was compared and found not to match the petitioner." Pet., at 13. He also contends that "[t]he state suppressed the exculpatory palmprint and made a false statement in a state police laboratory report to make it appear as though the palmprint had not been compared to petitioner's and may be inculpatory. The local officer in charge read the lab report to the jury leaving a false impression of guilt." *Id*. at 14-15. A review of the record, however, belies these assertions. At trial John Calabrese, the Eastpoint Police Officer in charge of the investigation, did not testify in any respect concerning the palmprint on direct examination. Rather, on *cross-examination* defense counsel went through a litany of physical evidence that Officer Calabrese did not have. As part of this questioning, counsel asked Calabrese about the latent prints that had been lifted from the scene. These prints had been sent to the Michigan State Police for analysis. Calabrese testified that he could not recall specifically but could look for the laboratory report, but did at that time state his recollection that "the report was negative, that there was no, that the prints were unsuitable for comparison." Trial Tr., Vol. 7, at 1437. The report itself states that "[o]ne of the latent prints submitted is suitable for identification purposes and appears to be a palm impression. A search was made at the Central Records Division for a copy of

the above listed suspect's palm impression with no record of his palm prints on file."[2] After the report had been located, counsel again questioned Calabrese and Calabrese corrected his earlier testimony:

> Q. All right. Detective, during the break you had an opportunity to acquire I believe the laboratory report from the State Police. You testified earlier that there were in fact three prints from the scene of the crime that were submitted to the State Police for analysis; is that correct?
> A. That's correct.
> Q. And I think your testimony was that one of them were suitable or usable?
> A. Well, apparently one was but there was nothing to match it to.
> Q. So you were mistaken?
> A. Yes.
> Q. There was in fact a usable or suitable print for identification?
> A. According to the State Police, yes.
> Q. And according to the state politics [sic] there was no match?
> A. They didn't get a match. They requested a palm impression they had none on file to compare it to.

*Id*. at 1459-60. Subsequently, petitioner filed a request with the Michigan State Police, asking if his palm prints were on file. In a letter dated April 29, 1998, Identification Section Manager Joyce Woodward responded:

> Research of your request shows that yes we do have your palm prints on file with the Central Records Division. However, at this time we do not store palm prints on AFIS, they are manually filed. Your palm prints have been in the manual file since 1980.
>
> The AFIS is an automated <u>fingerprint</u> identification system. Your fingerprints have been on this automated system since 1989. These same prints were in the manual file since 1980.[3]

The response also included a copy of the palm print on file with the Michigan State Police, which

---

[2] A copy of the laboratory report is attached to petitioner's application for leave to appeal in the Michigan Supreme Court in connection with his state court post-conviction motion for relief from judgment.

[3] This letter, along with a copy of the palm print, are also attached as exhibits to petitioner's post-conviction brief in the Michigan Supreme Court.

reveals that the print was taken on August 14, 1980, and submitted by the Sanilac County Sheriff's Department.

With this record in view, petitioner's claim becomes rather focused. Contrary to petitioner's argument, there is absolutely no evidence to suggest that the State Police actually did a comparison and found no match between the palm print recovered at the scene and petitioner's palm print. The record establishes that no comparison involving the recovered palm print was ever made, and petitioner has pointed to no other evidence to suggest that such a comparison was, in fact, made. Nor does the failure of the police to run a comparison between the recovered palm print and petitioner's palm print state a *Brady* claim. As noted above, "*Brady* . . . does not require the government to create exculpatory material that does not exist." *Sukumolachan*, 610 F.2d at 687. As the Supreme Court has explained, the government in a criminal prosecution "do[es] not have a constitutional duty to perform any particular test." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988).

Nor does petitioner have a *Brady* claim based on the suppression of the Michigan State Police laboratory report, because that report was not "suppressed" within the meaning of *Brady*. Even assuming that the report had not been disclosed to petitioner's counsel prior to trial (a fact not made clear by the record), it was disclosed during Officer Calabrese's testimony and counsel was able to cross-examine Calabrese regarding his earlier incorrect testimony about the contents of the report. Because the purpose of *Brady* is to permit a defendant to put all exculpatory information before the jury, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (internal quotation omitted). Even where " previously undisclosed evidence is disclosed . . . during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure."

9

*Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998) (internal quotation omitted); *accord Davis*, 306 F.3d at 421 ("Delay violates *Brady* only where the delay causes prejudice."); *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994).

Thus, the only potentially suppressed evidence was the fact that petitioner's palm print was, in fact, on file with the State Police at the time the recovered palm print was sent to the State Police laboratory for identification. Even assuming that the evidence was both suppressed and exculpatory,[4] petitioner cannot establish a *Brady* violation because the evidence was not material. Under *Brady*, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *accord Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J.). Here, there is not a reasonable probability that the result of the proceeding would have been different had the existence of petitioner's palm print file been disclosed at trial. The existence of the palm print file had no substantive exculpatory value, and its only value would have been in impeaching Officer Calabrese's testimony regarding the reason why the recovered palm print was not compared with petitioner's palm print. Even on this basis, however,

---

[4]The Sixth Circuit explained its view that "[t]he palmprint record was *Brady* evidence because at a minimum Willis could have used it to impeach the credibility of the investigating officer who subsequently denied that the record existed." *Willis*, 329 Fed. Appx. at 16. This conclusion is simply incorrect. Officer Calabrese did not "deny that the record existed." Rather, in response to defense counsel's question Officer Calabrese testified that the State Police had indicated in their report that they had no print on file to run a comparison, and this testimony was fully consistent with the State Police report. In other words, Officer Calabrese did not deny that a palm print of petitioner existed, but merely related the contents of the report, which was the extent of his knowledge of the matter. The Court need not resolve whether this conclusion, made in the context of determining the appropriate starting date for the limitations period, is binding with respect to the Court's analysis of the substantive *Brady* claim because, as explained below, petitioner is unable to establish the materiality element of his *Brady* claim.

it would have had little impeachment value. Officer Calabrese himself had no knowledge as to the extent of the State Police files, and was testifying solely on the basis of what the State Police report had indicated. Thus, information that the state police in fact had petitioner's palm print on file would not have impeached Calabrese or damaged any of his other testimony, but merely would have impeached the laboratory report.

In his amended reply, petitioner points to hand-written notations on his 1980 palm print card that read "Thomas/20275-92/10-7-92" and "RETURN TO CRD." Petitioner also submits his own affidavit, in which he avers that he spoke by telephone with Doug Thorne, an employee of the Fingerprint Section of the Michigan State Police's Central Records Bureau. According to petitioner, Thorne told him that these notations indicate that an analyst named Thomas requested petitioner's palm print card for case #20275-92 on October 7, 1992, and that Central Records pulled the palm prints, made a photocopy of the palmprint card, and sent the copy to Thomas. *See* Amended Reply, Ex. 22. Assuming this to be true–notably, petitioner has presented no affidavit from Thorne or any other evidence besides his own hearsay–it does suggest that *Thomas* may have lied in his laboratory report. Thomas, however, did not testify at trial, and thus nothing that could impeach his testimony would have been relevant or material. Nor, as explained above, did Calabrese have any first hand knowledge of whether the State Police, an agency for which he did not work, had petitioner's palm print on file, making the assertion in Thomas's report irrelevant to any assessment of Calabrese's credibility. This leaves, again, only the assertion that the mere existence of the palm print in the Michigan State Police file was exculpatory and material. But as explained above, the existence of the palm print card itself had no substantive exculpatory value, and thus was not material.

There was extensive eyewitness testimony against petitioner, and defense counsel strove mightily to impeach or otherwise call into question that testimony, and at times succeeded in doing so. Counsel also focused extensively, particularly in his cross-examination of Officer Calabrese, on the utter lack of physical evidence tying petitioner to the crime. Petitioner presented a vigorous alibi and misidentification defense, calling witnesses who testified both as to his whereabouts on the day and time of the crime and his appearance at that time, which did not match the descriptions given by the witnesses. During closing argument, defense counsel argued extensively that the evidence showed that Calabrese had focused on petitioner as a suspect and had coached the witnesses. *See* Trial Tr., Vol. 10, at 1853-58. Counsel also argued that the evidence showed that petitioner's fingerprints had been sent to the State Police and compared with fingerprints from the scene, and no match was found, and that there was no other physical evidence tying petitioner to the crime even though physical evidence such as fingerprints and shoe prints were at the scene. Counsel argued that this showed, at a minimum, that the police investigation was sloppy. *See id.* at 1858-61. Counsel also pointed out that an evidence technician testified that there was video of both the interior and exterior of the party store, but no testimony that the video evidence showed petitioner. *See id.* at 1862. Thus, counsel argued extensively that the police had failed to conduct an adequate investigation and that the witnesses' identifications were incorrect, and pointed to voluminous testimony to support his argument.

Despite this evidence, and despite petitioner's own alibi evidence, the jury nonetheless credited the prosecution witnesses' in-court identifications of petitioner as the perpetrator. Given the extensive impeachment of the prosecution case already before the jury, it is highly doubtful that one additional point of impeachment, on a collateral matter which was not actually within the

12

testifying witness's personal knowledge, would have affected the jury's verdict. Much less is there a "reasonable probability" that the result of petitioner's trial would have been different had it been disclosed that the State Police in fact had a copy of petitioner's palm print on file. *See Parker v. Sirmons*, 237 Fed. Appx. 334, 336-37 (10th Cir. 2007) (purportedly false testimony of state's hair expert did not warrant a new trial where conflicts in hair evidence were exposed at trial and jury accepted eyewitness testimony); *United States v. Stewart*, 323 F. Supp. 2d 606, 620-21 (S.D.N.Y. 2004) (no reasonable likelihood that false testimony of government ink expert regarding who performed ink test affected jury's verdict where testimony went to collateral matter, expert's testimony was attacked on cross-examination, and defense counsel repeatedly questioned expert regarding government's decision not to perform particular tests); *Bell v. Coughlin*, 820 F. Supp. 780, 789-90 (S.D.N.Y.), *aff'd*, 17 F.3d 390 (2d Cir. 1993). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

D.     *Recommendation Regarding Certificate of Appealability*

   1.     *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack*

*v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a

14

recommendation regarding the certificate of appealability issue here.

   2. *Analysis*

Here, if the Court accepts my recommendation regarding petitioner's habeas application the Court should also conclude that a certificate of appealability is not appropriate because the Court's resolution of the materiality issue is not reasonably debatable. In light of the voluminous evidence impeaching the police investigation and the eyewitness identifications, and counsel's extensive arguments regarding these matters, it is not debatable that the existence of an additional, collateral point of impeachment does not create a "reasonable probability" that the result of petitioner's trial would have been different had this fact been disclosed to the jury. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

G. *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court agrees with this recommendation, the Court should also deny petitioner a certificate of appealability.

III. <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections

which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives<br>
PAUL J. KOMIVES<br>
UNITED STATES MAGISTRATE JUDGE

Dated: 11/16/10

---

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on November 16, 2010.

s/Eddrey Butts<br>
Case Manager